## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

H.F.S. PROPERTIES, a Minnesota
Limited Partnership,

        Plaintiff,

v.

        **MEMORANDUM OF LAW & ORDER**
        Civil File No. 15-3273 (MJD/SER)

FOOT LOCKER SPECIALTY, INC.,

        Defendant.

Scott G. Harris, David G. Parry, and Benjamin D. Eastburn, Stinson Leonard
Street LLP, Counsel for Plaintiff.

James J. Hartnett, IV, and Kyle R. Hardwick, Faegre Baker Daniels LLP, Counsel
for Defendant.

## I.  INTRODUCTION

This matter is before the Court on the parties' cross-motions for partial

summary judgment.  [Docket Nos. 25, 30]  The Court heard oral argument on

September 30, 2016.

## II.  BACKGROUND

### A.  Factual Background

1

## 1.    The Parties

This is a landlord-tenant dispute regarding the Woolworth Building ("Building"), located at 81 7th Place East, St. Paul, Minnesota.  Plaintiff H.F.S. Properties, a Minnesota Limited Partnership ("HFS") is the owner and landlord of the Building.  Defendant Foot Locker Specialty, Inc. ("Foot Locker") was the tenant.  (Foot Locker was formerly known as F.W. Woolworth Company, but will be referred to as Foot Locker throughout.)  Generally, HFS claims that Foot Locker failed to keep the Building in good repair.  Currently before the Court is the question of the measure of damages for HFS's claims.

## 2.    The 1920 Lease

On July 1, 1920, lessor Henry Stein leased a parcel of land in St. Paul, Minnesota, to lessee The Golden Rule, a Minnesota corporation.  (Parry Decl., Ex. A, 1920 Lease.)  The 1920 Lease has a term of 95 years and expired on June 30, 2015.  (Id. at 1.)  The 1920 Lease defines the "premises" under the lease as the real property together with any building or buildings thereon, and any and all appurtenances thereto.  (Id.)

Article 2 of the 1920 Lease provides that the lessee agrees:

To keep said premises and the appurtenances thereof in good order and repair during the said term, and faithfully to keep and observe

all statutes and ordinances in force, relating to said leased premises,
or the use thereof.

Article 4 provides that the lessee

may remove, take down or alter any other building or buildings
now or hereafter to be placed upon said demised premises, but in
such event, or in the event of the destruction of any building or
buildings, the lessee shall replace the same by a building or
buildings of at least equal value, which shall be maintained in the
same manner as herein stipulated as to the original buildings, and it
shall become a part of the realty belonging to the lessor, the same as
the original buildings, subject to the leasehold interest therein of the
lessee herein, and lessee may retain as its own property any and all
material of the building or buildings so taken down or removed, and
not used in the construction of said new or completed building.

### 3.  The 1949 Lease

On June 9, 1949, Tenant Foot Locker leased the lot adjoining the lot named

in the 1920 Lease from six individuals, collectively referred to as "Landlord."

(Parry Decl., Ex. B, 1949 Lease.)  The 1949 Lease expired on June 30, 2015.  (Id.,

Art. 3.)  The premises governed by the lease consisted of the real property plot

"with the buildings now or hereafter constructed upon said premises . . . together

with all alley rights, if any, easements, rights and appurtenances in connection

therewith or thereunto belonging."  (Id., Art. 2.)

Under Article 12 of the 1949 Lease, the Landlord procured an assignment of the lessee's interest in the 1920 Lease to Foot Locker so that Foot Locker became the successor-in-interest to the lessee's interest in the 1920 Lease.

Article 14 of the 1949 Lease provides:

> The Tenant agrees to commence demolition of the existing building and to construct a new building of at least three (3) stories with basement to cover substantively the entire demised premises and adjoining premises [covered by the 1920 Lease] prior to August 1, 1958, with reasonable additional time thereafter in the event the Tenant is delayed by causes beyond the reasonable control of the Tenant. The Tenant shall be entitled to all salvage from demolition of the existing building.

Under Article 5:

> The Tenant agrees to deliver to Landlord physical possession of the demised premises upon the termination of the term hereof or any extension thereof, in good condition, wear and tear, damage by fire, or damage from any other cause not directly attributable to the negligence of the Tenant excepted.

Article 7 provides that the tenant can alter the premises, including by making structural changes and including that the Tenant "may from time to time during the term hereof remove walls." However, "[a]ny such alteration, additions and changes, and any new building which shall remain on the demised premises at the end of the term of this lease . . . shall be considered as improvements to and become a part of the real estate of the Landlord, and the

4

Tenant shall have neither the right nor the obligation to remove the same, nor

change such structure or restore the premises to the condition in which they

were originally."

Article 8 provides, in relevant part:

Any trade fixtures, equipment and other personal property installed
in or attached to the demised premises by and at the expense of the
Tenant shall remain the property of the Tenant, and the Landlord
agrees that the Tenant shall have the right at any time, and from
time to time, to remove any and all of its trade fixtures, equipment,
and other personal property which it may have stored or installed in
the demised premises, including but not limiting the same to
counters, shelving, show cases, mirrors, slides and air-conditioning,
cooling and other moveable machinery.

Article 13 provides, in relevant part:

The Tenant further agrees that if the building on the demised
premises is damaged or destroyed by fire or the elements . . . that the
Tenant will repair or restore the same to substantially the same
condition as existed before such damage or destruction, or may
replace the same with a building of at least equal value to the one
damaged or destroyed.

### 4.    Construction of the Woolworth Building

In 1955, Foot Locker constructed the Woolworth Building on the two

adjoining lots covered by the 1920 Lease and the 1949 Lease.  (Compl. ¶ 18; Parry

Decl., Ex. D, Foot Locker's Objections and Responses to Plaintiff's First Set of

Interrogatories and Requests for Admission at 3-4.)  Foot Locker operated a

Woolworth's retail store in the Woolworth Building between 1956 and 1993

under the 1920 and 1949 Leases.  (Id. at 7; Parry Decl., Ex. F, Yost Dep. 16-18.)

The Woolworth Building has a basement and three above-ground floors, totaling

approximately 50,000 square feet.  There are no windows on the second floor and

minimal windows on the third floor.  The third floor and basement are only

accessible by stairs or a freight elevator.  (Hartnett Decl., Ex. 2 at HFS4584-85;

Hartnett Decl., Ex. 3.)

Under the two leases, Foot Locker paid all costs associated with the

Building, such as taxes and insurances, and paid $65,000 per year in rent through

June 30, 2015.  (Hartnett Decl., Ex. 1 at HFS1715.)

In 1988, the St. Paul Port Authority advised that, if a negotiated sale of the

Building could not be made, it would acquire the Building by eminent domain in

order to redevelop the property.  (Hartnett Decl., Ex. 4.)  In 1990, the previous

landlord and Foot Locker executed an agreement to sell the Woolworth Building

to a developer for $1.5 million, approximately $550,000 of which would go to

Foot Locker to buy out its leasehold interest.  (Hartnett Decl., Ex. 5.)  However,

the sale fell through.

### 5.   The Woolworth Building's Initial Disuse

Foot Locker ceased occupying the Woolworth Building on August 1, 1993, and the Building was unoccupied until April 2, 1998.  (Parry Decl., Ex. D, Foot Locker's Objections and Responses to Plaintiff's First Set of Interrogatories and Requests for Admission at 7.)  From April 2, 1998, through December 31, 2000, Foot Locker entered a sublease with McGough Construction Co., Inc. ("McGough") to convert the Woolworth Building into construction offices.  (Id.; Hardwick Decl., Ex. 1.)  McGough built more than a dozen new rooms in the Woolworth Building, ran HVAC, electric and other services to these rooms, and installed a new roofing membrane on the building.  (Hardwick Decl., Ex. 1 at FL712; Hardwick Decl., Ex. 2 at FL714, FL768-70.)  The City of St. Paul (the "City") approved McGough's work and issued a new Certificate of Occupancy after the work was completed, on July 16, 1998.  (Hardwick Decl., Ex. 3 at HFS1593.)

### 6.   HFS's Purchase of the Property

HFS owns the Golden Rule Building, which is adjacent to the Woolworth Building.  (Hartnett Decl., Ex. 6, HFS 30(b)(6) Dep. 74.)  HFS first attempted to

acquire the Woolworth Building in 1998 in order to demolish it and convert the

property into a parking lot.  (Id. 68-70.)

In 1998, HFS obtained an appraisal valuing the Woolworth Building's land

at $565,000 and the leasehold and discounted future rents at $500,000.  (Hartnett

Decl., Ex. 6, HFS 30(b)(6) Dep. 72-73; Hartnett Decl., Ex. 2 at HFS4634.)  The

appraisal stated: "The property has substantial functional obsolescence and

significant deferred maintenance;" and "[c]onsiderable market research has

concluded that the Highest and Best Use of the building is to demolish the

existing improvement and redevelop the land to its Highest and Best Use."

(Hartnett Decl., Ex. 2 at HFS4611, 4634.)

In 1999, HFS bought the property that was the subject of the 1920 and 1949

Leases.  (Parry Decl., Ex. E, HFS's Answers and Objections to Defendant's First

Set of Interrogatories at 9-10.)  For $1.2 million, HFS received the land and an

assignment of both Leases and became the successor-in-interest to the lessor's

interest in the 1920 Lease and the Landlord's interest in the 1949 Lease.  (Id.;

Hartnett Decl., Ex. 6, HFS 30(b)(6) Dep. 87-88)  HFS acknowledges that there is

no clause in either lease that required Foot Locker to occupy the Woolworth

Building.  (Hartnett Decl., Ex. 6, HFS 30(b)(6) Dep. 58-59.)

In September 1999, HFS engaged an architect to develop plans that would require demolition of the existing Woolworth Building.  (Hartnett Decl., Ex. 6, HFS 30(b)(6) Dep. 91-92; Hartnett Decl., Ex. 12.)  From 1996 through October 2014, Patricia Wolf, a limited partner in HFS and owner of the property management company that manages both the Golden Rule Building and the Woolworth Building, was the primary negotiator on behalf of HFS with respect to Foot Locker's leasehold interest in the Woolworth Building.  (Hartnett Decl., Ex. 6, HFS 30(b)(6) Dep. 13, 16; Hartnett Decl., Ex. 8, Wolf Dep. 16.)

### 7.    The Second Period of Vacancy

Foot Locker left the Building unoccupied from January 1, 2001, until the surrender of the Building to HFS on June 30, 2015.  (Parry Decl., Ex. D, Foot Locker's Objections and Responses to Plaintiff's First Set of Interrogatories and Requests for Admission at 7.)

### 8.    Deferred Maintenance

When HFS or the City identified a maintenance issue with the Woolworth Building, Foot Locker resolved the issue.  (Hardwick Decl., Ex. 4, Maletz Dep. 16, 52-53.; Hartnett Decl., Ex. 6, HFS 30(b)(6) Dep. 33-36.)  Foot Locker arranged for a consultant, Mark Wange, to perform inspections of the Woolworth Building

twice a month.  (Hardwick Decl., Ex. 4, Maletz Dep. 19-20.)  Foot Locker made a

business decision to defer some repairs and maintenance on the Woolworth

Building, with the aim of negotiating an end of the Leases with HFS that might

include a cash payment in lieu of repairs, or some other arrangement.  (Eastburn

Decl., Ex. A, Yost Dep. 41-46.)

The City provided notices of Certificate of Occupancy Revocation in 2004,

2005, and 2008 because the Building was registered as a vacant building.  (Joint

Statement of Steve Magner and Phillip Owens ¶¶ 4-6; id. Exs. A-C.)  The Notices

listed deficiencies under and violations of Chapter 34 of the St. Paul Legislative

Code ("SPLC"), Minimum Property Maintenance Standards for All Structures

and Premises; the Minnesota State Building Code ("MSBC"); and the Minnesota

State Fire Code ("MSFC"), all of which needed to be corrected before the City

would allow the building to be reoccupied.  (Magner & Owens Statement, Exs.

A-C.)

On February 22, 2014, a water pipe broke and flooded the basement of the

Woolworth Building.  (Hardwick Decl., Ex. 6, at FL 175.)  The City inspected the

Woolworth Building on February 24, 2014, following the flooding.  (Magner &

Owens Statement ¶ 8; id., Ex. D.)  On February 25, 2014, the City issued a

Correction Notice – Complaint Inspection with a list of several violations that "must be corrected immediately," and warned that "[f]ailure to comply may result in a criminal citation or revocation of the Certificate of Occupancy." (Id., Ex. D.)  The Correction Notice also stated: "Uncertified portions of the building must not be occupied until inspected and approved by this office.  – This is a registered category 3 vacant building.  Building cannot be occupied until inspected and approved by this office.  All work must be done by a qualified contractor under permit." (Id.)  Foot Locker corrected the violations listed in the 2014 Correction Notice and remediated the damage from the flooding at a cost of more than $150,000.  (Hartnett Decl., Ex. 6, HFS 30(b)(6) Dep. 33-36; Hardwick Decl., Ex. 6, at FL 175.)

Foot Locker was aware of the code deficiencies listed in the City's Notices, but did not ever seek a re-inspection from the City to seek approval for occupancy.  (Eastburn Decl., Ex. A, Yost Dep. 169-73; Eastburn Decl., Ex. B, Maletz Dep. 163-69.)  Foot Locker was aware that, on the June 30, 2015 surrender date, the Woolworth Building could not be legally occupied.  (Maletz Dep. 168.)

On July 1, 2015, the day after the Leases ended, the City conducted a code compliance inspection of the Woolworth Building and issued a Code Compliance

Notice setting forth 110 code violations that had to be corrected before the City

will issue a Certificate of Occupancy for the Building.  (Magner & Owens

Statement ¶¶ 14-17; id., Ex. E.)

### 9.   Buy-Out Negotiations

In October 2002, Foot Locker offered to buy out its leasehold interest by

paying HFS $525,000.  (Hartnett Decl., Ex. 6, HFS 30(b)(6) Dep. 103; Hartnett

Decl., Ex. 13 at HFS4661.)  Wolf told her partners at HFS that she believed that

Foot Locker's future rent, maintenance, and other leasehold expenses had a

present value of $1.3-1.8 million.  (HFS 30(b)(6) Dep. 106; Hartnett Decl., Ex. 13 at

HFS4659.)  She recommended that HFS attempt a lease buyout, making an initial

counter-offer of $1.8 million, and raze the Woolworth Building to create a surface

parking lot.  (HFS 30(b)(6) Dep. 106-07; Hartnett Decl., Ex. 13 at HFS4656-57.)

Wolf's HFS partners authorized her to proceed with negotiations.  On December

16, 2002, she wrote Foot Locker regarding buyout negotiations and noted that the

Woolworth Building "would have to be gutted and completely reconstructed.

The HVAC, electrical, plumbing, fire life safety and elevators are not up to code."

(HFS 30(b)(6) Dep. 117, 121-24; Hartnett Decl., Ex. 1 at HFS1715, 1713.)  At that

time, HFS believed that Foot Locker was in breach of the Leases by failing to

12

maintain the Woolworth Building in good order and repair.  (HFS 30(b)(6) Dep. 123-24.)

In February 2003, Wolf spoke to a Foot Locker representative; Wolf summarized the conversation as follows: "We danced around the buyout price. He offered us a million dollars, kind of.  I told him in an effort to get the discussion moving I would put a 1,500,000 on the table . . . ."  (HFS 30(b)(6) Dep. 126-27.)  However, buyout negotiations stalled.

By no later than February 2004, HFS knew that the Woolworth Building was a Registered Vacant Building under the City's Ordinance.  (Hartnett Decl., Ex. 16.)

In April 2009, HFS again advised Foot Locker that the Woolworth Building was in disrepair.  (HFS 30(b)(6) Dep. 38; Hartnett Decl., Ex. 14, HFS's Am. Ans. to Interrog. No. 7.)  In the summer of 2009, Foot Locker proposed a buyout for approximately $500,000.  (HFS 30(b)(6) Dep. 135-36; Hartnett Decl., Ex. 15 at HFS5074.)

On September 15, 2010, HFS, through counsel, sent a letter to Foot Locker reiterating that HFS believed Foot Locker to be in breach of the Leases by failing to maintain the Woolworth Building.  (Hartnett Decl., Ex. 18.)  The letter stated:

13

> We hereby demand that you immediately seek to restore the Premises to "good condition and repair."
>
> As an alternative to making the necessary repairs, the Lessor would be amenable to allowing Foot Locker/Woolworth's to arrange for the complete demolition of the Premises.

(Id. at 2.)  HFS testified that it did not intend to make this offer and would only have accepted demolition plus a payment.  (Hartnett Decl., Ex. 6, HFS 30(b)(6) Dep. 162.)

On February 8, 2011, Foot Locker sent an email to Wolf stating that Foot Locker would be obtaining an estimate for repairing the Building "to bring the building back to the condition required by the lease for a return at the end of the term.  Further to our conversation, Pat, it sounds as though you folks would also entertain the idea of demolishing the building.  We'll develop a price for that as well."  (Eastburn Decl., Ex. E.)  Foot Locker obtained an estimate from Cornerstone Construction Management, Inc. ("Cornerstone").  (Eastburn Decl., Ex. F.)  It told Cornerstone: "Per the lease: Foot Locker is responsible for maintaining building.  The building will need to be operational at time of turnover."  (Id.)  Foot Locker asked Cornerstone to include certain items in its estimate including a "new roof," "new heating and cooling system," and an "elevator estimate."  (Id.)  Cornerstone provided a $1.8 million estimate to

renovate the building and a $710,000 estimate to demolish the building.

(Eastburn Decl., Ex. G.)

In November 2013, Wolf advised Foot Locker that demolition of the

Woolworth Building was "the most obvious alternative" for the building but that

HFS had a "mild interest" in the renovation option.  (Hartnett Decl., Ex. 8, Wolf

Dep. 54-55.)

On October 24, 2014, HFS demanded that Foot Locker pay $11,123,000 to

"cure the deficiencies set forth in the property condition report" regarding the

Woolworth Building.  (Hartnett Decl., Ex. 19 at FL1718.)

On March 31, 2015, Foot Locker provided HFS an estimate from

Cornerstone for $653,840 representing the "cost to put the premises in the

condition required upon expiration of the term of the leases."  (Eastburn Decl.,

Ex. I.)  The 2015 estimate included repairing walls and ceilings, installing a new

elevator car, and testing the heating system "in preparation of putting into

service."  (Id.)

In April 2015, HFS rejected Foot Locker's offer to perform $653,000 worth

of repairs to the Woolworth Building and instructed Foot Locker to not perform

any such repair work because it opined that more extensive repairs were

required and there would be "no value" in completing the proposed less

extensive repairs.  (Parry Decl., Ex. K.)

### 10.   Surrender

On June 30, 2015, Foot Locker surrendered the Woolworth Building to

HFS.  The building remains a category 3 vacant building.  (Magner & Owens

Statement ¶ 8.)

### B.   Procedural History

On June 26, 2015, HFS served Foot Locker with a Complaint venued in

Ramsey County District Court.  The Complaint alleged: Count One: Breach of

Contract; Count Two: Negligence; Count Three: Waste; and Count Four:

Declaratory Judgment.  [Docket No. 1-1]  Foot Locker served an Answer on July

16.  (Parry Decl., Ex. C.)  In its Answer, Foot Locker asserted the defenses of

economic waste, betterment, unjust enrichment, waiver, laches, and estoppel.  It

also asserted that HFS's claims were barred by the Leases and that HFS was not

the real party in interest.  Foot Locker did not assert a statute of limitations

defense.

On August 13, 2015, Foot Locker removed the matter to this Court based on diversity jurisdiction.  [Docket No. 1]  The deadline for amending the pleadings expired on January 7, 2016.  ([Docket No. 10] Scheduling Order at 1.)

With the Court's permission, both parties have now filed early motions for partial summary judgment.  The parties represented that a decision on the applicable measure of damages will promote settlement and narrow the issues for discovery.

HFS requests that the Court strike Foot Locker's affirmative defense of economic waste and rule that the measure of damages associated with HFS's breach of contract claim is tied to the costs necessary to repair the Woolworth Building in accordance with the terms of the Leases and to bring the Woolworth Building to the condition required by the Leases.

Foot Locker requests that the Court grant summary judgment on Count Two: Negligence; Count Three: Waste; and Count Four: Declaratory Judgment. It further requests that the Court grant summary judgment on the breach of contract claim to the extent it is based on Article 2 of the 1920 Lease based on the statute of limitations.  It asks the Court to order that HFS is responsible for bringing the Woolworth Building into compliance with current building codes

following termination of the Leases.  If also requests that the Court order that,

under Articles 7 and 8 of the 1949 Lease, Foot Locker is not responsible for repair

or replacement costs associated with the Woolworth Building's interior walls,

mechanical systems, electrical systems, or other fixtures, equipment, or moveable

machinery in the Building.  Finally, Foot Locker requests that the Court order

that the diminution in value is the proper measure of damage for the breach of

contract claim and that this amount shall be calculated as the difference between

the value of the Building (excluding Foot Locker's fixtures and equipment)

delivered in "good condition, wear and tear . . . or damage from any other cause

not directly attributable to the negligence of the Tenant excepted" and the value

of the Woolworth Building as actually delivered by Foot Locker on June 30, 2015.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  <u>Celotex</u>, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

The Court denies Foot Locker's request to strike the Joint Statement of Steve Magner and Phillip Owens [Docket No. 35].  The Joint Statement is notarized, subscribed, and sworn.  Magner and Owens have personal knowledge of the notices appended to the Joint Statement through their positions with the Department of Safety and Inspections and their review of the Department's official records.  Additionally, the attached notices are public records under Federal Rule of Evidence 803(8) and the quoted ordinances are publicly available statutes.

## B.     Choice of Law

Minnesota law applies to the claims before the Court.  Plaintiff is a Minnesota citizen; the lawsuit relates to Minnesota property; the property is subject to Minnesota building codes and regulations; and the lawsuit was filed in Minnesota.  The parties do not dispute that Minnesota law applies.

## C.     Count Two: Negligence

The Court denies Foot Locker's request to dismiss HFS's negligence claim.

Under Minnesota law, "a party is not responsible for damages in tort if the duty breached was merely . . . imposed by contract, and not imposed by law." Glorvigen v. Cirrus Design Corp., 816 N.W.2d 572, 584 (Minn. 2012) (citation omitted). "[W]hen a contract provides the only source of duties between the parties, Minnesota law does not permit the breach of those duties to support a cause of action in negligence." Id. (citation omitted). However, "if a relationship would exist which would give rise to the legal duty without enforcement of the contract promise itself, the negligence claim may be viable." Berger v. Nationstar Mortgage LLC, 118 F. Supp. 3d 1121, 1126 (D. Minn. 2015) (citations omitted). In general, the relationship between a tenant and landlord can give rise to a legal duty beyond that created by the contract. See, e.g., Southcross Commerce Ctr., LLP v. Tupy Properties, LLC, 766 N.W.2d 704, 707 (Minn. Ct. App. 2009) ("A lease is both an executory contract and a present conveyance, and creates a privity of contract and a privity of estate between the lessor and the lessee.") (citation omitted); N. Freeway Investors v. Racers Exch. Warehouse, Inc., No. C5-92-615, 1992 WL 182984, at *1 (Minn. Ct. App. Aug. 4, 1992) ("The contract rights under a lease, including the right to receive rent, may be separated from the rights in the real estate itself.") (citations omitted).

"In the absence of a lease provision to the contrary, a tenant is generally liable in tort to its landlord for damages to the leased property caused by the tenant's negligence."  RAM Mut. Ins. Co. v. Rohde, 820 N.W.2d 1, 13 (Minn. 2012).  In this case, neither Lease exempts Foot Locker from liability for negligence.  Therefore, at this stage of the litigation and on the current record, the Court denies Foot Locker's motion to dismiss the negligence claim.

### D.    Count Three: Waste

The Court denies Foot Locker's request to dismiss the waste claim.

> Waste is conduct by a person in possession of land which is actionable by another with an interest in that same land to protect the reasonable expectations of the nonpossessing party.  Waste involves more than just ordinary depreciation, it involves negligence or intentional conduct which results in material damage to the property.
>
> * * *
>
> An action for waste is based on the premise that a person in possession of land owes another with an interest in the same land a duty to prevent unreasonable abuse or neglect to the land.

Rudnitski v. Seely, 452 N.W.2d 664, 666, 667 (Minn. 1990) (citations omitted).

In Rudnitski, which addressed a contract-for-deed transaction, the Minnesota Supreme Court held that a waste claim did not lie because the vendors had no right to recover until the contract was breached.  452 N.W.2d at

667.  In other words, the vendor had no property interest in the property until

the vendee breached the contract for deed.  Thus, the right to sue for waste was

dependent upon the breach of contract and failed.  In a lease transaction, as is

currently before this Court, the landlord maintains a property interest in the

property apart from the lease contract.  Thus, HFS had a right to protect its

property rights at all times, whether or not Foot Locker breached the Leases, and

its waste claim is not dependent on its contract claim.  Therefore, at this stage of

the litigation and on the current record, the Court denies Foot Locker's motion to

dismiss the waste claim.

### E.    Count Four: Declaratory Judgment

The Court denies Foot Locker's request to dismiss the declaratory

judgment claim as duplicative of the breach of contract claim.

> Where a party's declaratory judgment claim is purely duplicative of
> its breach of contract claim, the declaratory judgment claim may be
> properly dismissed.  However, the mere fact that claims for
> declaratory judgment and breach of contract are closely related—
> even where the declaratory judgment claim "encompasses" the
> breach of contract claim—does not require dismissing the
> declaratory judgment claim.

MidCountry Bank v. Rajchenbach, No. 15-CV-3683 (SRN/TNL), 2016 WL

3064066, at *3 (D. Minn. May 31, 2016) (citations omitted).  If the declaratory

judgment claim is "broader in scope" than the breach of contract claim, both

claims may be pled.  Id. at *4.

Here, HFS's Complaint seeks a declaration that Foot Locker breached its

obligations under the Leases and that HFS is entitled to the cost of repairs

required by the City for a certificate of occupancy.  (Compl. ¶ 55.)  Thus, the

declaratory judgment claim is broader than the breach of contract claim.

Therefore, at this stage of the litigation and on the current record, the Court

denies Foot Locker's motion to dismiss the declaratory judgment claim.

### F.   Statute of Limitations

The Court denies Foot Locker's request to dismiss the breach of contract

claim, to the extent that it is based on Article 2 of the 1920 Lease, based on the

statute of limitations.

Under Minnesota law, the statute of limitations for breach of contract is six

years from the date of the breach.  See Minn. Stat. § 541.05, subd. 1.  "A cause of

action for breach of contract [generally] accrues at the time of the alleged breach.

This is true even when actual damages resulting from the breach do not occur

until some time afterwards or when the aggrieved party was ignorant of the facts

constituting the breach."  Jacobson v. Bd. of Trustees of the Teachers Ret. Assn.,

627 N.W.2d 106, 110 (Minn. Ct. App. 2001) (citations omitted).

Under Article 2 of the 1920 Lease, Foot Locker agreed:

[t]o keep said premises and the appurtenances thereof in good order and repair during the said term, and faithfully to keep and observe all statutes and ordinances in force, relating to said leased premises, or the use thereof.

Foot Locker asserts that, because HFS admits that it accused Foot Locker of breaching Article 2 of the 1920 Lease before June 26, 2009, and HFS did not commence this lawsuit until June 26, 2015, the breach of contract claim based on Article 2 is time barred.

The Court denies Foot Locker's motion because Foot Locker's alleged breach of Article 2 was ongoing and continued up until the surrender date of June 30, 2015.  Under Minnesota law,

[w]here a contract provides for continuing performance over a period of time, each breach may begin the running of the statute anew such that accrual occurs continuously.  In other words, where an agreement places a continuing duty on a party for a duration of time, the right to maintain an action for its breach continues as long as the plaintiff is damaged thereby.

Moore v. Medtronic, Inc., No. CIV. 99-2066 (ADM/AJB), 2001 WL 1636248, at *2 (D. Minn. July 30, 2001) (citations omitted).  When a lease requires a tenant to keep a building in a particular condition and the tenant fails to do so over time, the breach is continuing.  For example, the Minnesota Supreme Court has held

that "the breach of a lease condition that a stairwell be kept clean was continuing

and [t]he receiving of rent from month to month would be effectual as a waiver

for the past breach of it, but that would not relieve the tenant from the duty of

performance in the future." Christy v. Berends, No. A07-1451, 2008 WL 2796663,

at *3 (Minn. Ct. App. July 22, 2008) (citing Gluck v. Elkan, 30 N.W. 446, 446

(Minn. 1886)).  Foot Locker's repair obligations remained in effect until the day

the Leases ended, and HFS brought this lawsuit within six years after the Leases'

term ended.  Furthermore, the question of whether HFS waived Foot Locker's

breach cannot be definitively answered on the current record; discovery is

ongoing.  Therefore, at this stage of the litigation and on the current record, the

Court denies Foot Locker's motion to dismiss Count One based on the statute of

limitations.

### G.    Applicable Measure of Damages for Breach of the Leases

The key disagreement between the parties is the measure of damages for

Count Once: Breach of Contract.  If Foot Locker is found to be liable, the parties

disagree regarding whether it would be liable for the cost of repairing the

Woolworth Building to comply with the Lease obligations or whether it would

be liable for the difference in the value of the Woolworth Building on the date of

surrender and the value it would have had if the repairs were made.  The parties

then disagree on the extent of repairs that would be required under the Leases.

### 1.    Standard for Measuring Contract Damages for Injuries to Property

"A lease is a contract which should be construed according to ordinary

rules of interpretation."  Amoco Oil Co. v. Jones, 467 N.W.2d 357, 360 (Minn. Ct.

App. 1991).  "[C]ourts must read contract terms in the context of the entire

agreement, and the terms should not be construed in a manner that leads to a

harsh and absurd result."  Gorog v. Best Buy Co., 760 F.3d 787, 793 (8th Cir. 2014)

(citation omitted) (applying Minnesota law).  The Court "construe[s] the parties'

agreement as a whole and attempt to harmonize all clauses of the contract in

order to give effect to the parties' intention."  Id. (citation omitted).  Under

general contract principles, "the appropriate measure of damages for breach of

contract is that amount which will place the plaintiff in the same situation as if

the contract had been performed."  Peters v. Mut. Ben. Life Ins. Co., 420 N.W.2d

908, 915 (Minn. Ct. App. 1988).  See also W. Oil & Fuel Co. v. Kemp, 245 F.2d 633,

644 (8th Cir. 1957) ("A party recovering damages for breach of contract should

not be better off because of the breach than he would have been had there been

no breach.") (quoting Swaney v. Crawley, 157 N.W. 910, 911 (Minn. 1916)).

Foot Locker asserts that the Court should apply the formula used in tort

and construction contract cases to calculate damages here:

> The usual measure of damages for breach of a construction contract
> is the cost of reconstruction.  If reconstruction is not possible without
> unreasonable economic waste, the proper measure of damages is the
> difference in value between what was contracted for and what was
> actually built.

Asp v. O'Brien, 277 N.W.2d 382, 384 (Minn. 1979).  Unreasonable economic waste

has been found when "the cost of reconstructing [] would greatly exceed the

original cost of building;" what was constructed was "functional as built;" and

"[t]he defects were essentially cosmetic rather than structural."  Id.

The Court concludes that, in this case, the appropriate measure of damages

for Count One is the cost of repairing the Woolworth Building to comply with

the Lease obligations rather than the diminution in value.  Under Minnesota law,

there is no basis to apply the construction contract measure of damages to the

lease context, and case law supports rejection of this theory.  "It is well-

established law in Minnesota that a landlord can recover the expenditures

necessary to restore the premises to the original condition on the lessee's failure

to do so in accordance with the lease."  RPC Properties, Inc. v. Olson, No. A04-

2034, 2005 WL 1804474, at *5 (Minn. Ct. App. Aug. 2, 2005) (citing Storr v. Keljik,

227 N.W. 211, 211-12 (Minn. 1929)).  When a tenant fails to surrender the property in its original condition, in contravention of the lease's surrender clause, the landlord is entitled to recover "the reasonable value of such restoration."  Storr, 227 N.W. at 211.  See also Sassen v. Haegle, 147 N.W. 445, 445-46 (Minn. 1914) (addressing "action [] for damages for alleged violations of the covenants of a farm lease" by "landlord" against "tenant" and holding that, when a tenant covenants to perform certain obligations during the lease term and fails to do so, the landlord is entitled to "the reasonable cost of performance[;] [w]hether such performance affects the value of the [property] [i]s of no concern of [the tenant]").

Thus, the Court concludes that the measure of damages for HFS's breach of contract claim against Foot Locker is the reasonable cost of performing the repairs Foot Locker was required to perform under the Leases.  Because the Court has adopted the reasonable cost of repair measure of damages, it need not reach the question of willfulness.  Moreover, at this stage of the litigation, the question of whether any alleged breaches were willful or part of a good faith disagreement is a disputed fact question that cannot be resolved.

### 2.    Application of Particular Clauses in the 1920 and 1949 Leases

#### a)    Good Condition Requirements

Article 5 of the 1949 Lease provides that, upon termination of the Lease, the Tenant will deliver the premises, "in good condition, wear and tear . . . excepted."  Under clear Minnesota case law, standing alone, such a clause means that the landlord, not the tenant, has the obligation to make repairs necessitated by ordinary wear and tear that were necessary at the end of the Lease.  Thus, items that fell into disrepair due to ordinary use were not Foot Locker's obligation to repair under Article 5.  See, e.g., Fortune Funding, LLC v. Ceridian Corp., 368 F.3d 985, 988 (8th Cir. 2004) (holding that, under clause requiring tenant to "surrender the [Property] to [the landlord] in the condition in which the [Property was] originally received from [the landlord], except as repaired, rebuilt, restored, altered or added to as permitted or required hereby and except for ordinary wear and tear," landlord assumed obligation to make repairs caused by wear and tear because "requiring [the tenant] to make ordinary wear repairs would render the clauses 'except for ordinary wear and tear' and 'ordinary wear and tear excepted' meaningless") (applying Minnesota law); Kanner v. Globe Bottling Co., 78 Cal. Rptr. 25, 29 (Cal. Ct. App. 1969) ("The exception of ordinary

wear and tear contemplates that deterioration will occur by reason of time and use despite ordinary care for its preservation.  A tenant is not required to renovate the premises at the expiration of his lease; a covenant to repair should be reasonably interpreted to avoid placing any unwarranted burden of improvement of the lessor's premises on the lessee.") (citations omitted).

Article 2 of the 1920 Lease states that Foot Locker agreed "[t]o keep [the Woolworth Building] in good order and repair during the said [Lease] term." Article 2 does not contain the "wear and tear" exception found in the Article 5 surrender provision.  HFS claims that the surrender clause's wear-and-tear exception did not modify Foot Locker's obligation to make repairs during the term of the Leases without a wear-and-tear-exception, and, thus, Foot Locker was actually required to surrender the premises "in good order and repair."

The Court concludes that, reading the repair and surrender clauses together, the Leases obligated Foot Locker to surrender the Building in good condition, wear and tear excepted, and rejects HFS's claim that the repair clause held Foot Locker to a higher standard.

"When a repair clause and a surrender clause of this character are present in a lease, the repair clause cannot be considered alone.  Both clauses are to be

read together and construed together."  Milton R. Friedman & Patrick A.

Randolph, Jr., <u>Friedman on Leases</u> § 10.6.1 (5th Edition).  In general, "repair and

termination clauses should be construed together as imposing the same

obligation."  <u>Lindsay Bros. v. Milwaukee Cold Storage Co.</u>, 207 N.W.2d 639, 643

(Wis. 1973).

Minnesota courts have not addressed the particular scenario currently

before the Court.  HFS's reliance on <u>Storr v. Keljik</u> is inapposite because, in <u>Storr</u>,

the Minnesota Supreme Court recited the repair provision (without any

exceptions) and the surrender provision (with a "wear and tear of careful use"

exception) and then held that, after surrender, the tenant was liable for the cost of

restoring the premises "in the required condition."  227 N.W. 211, 211 (Minn.

1929).  The court did not address whether "wear and tear of careful use" applied

to that required condition or not.  Other jurisdictions have analyzed similar

clauses with varying results.  <u>See, e.g.</u>, <u>Nadler v. Am. Motors Sales Corp.</u>, 764

F.2d 409, 415 (5th Cir. 1985) (noting that, in some cases, the interplay of two such

clauses "support[s] a finding that the surrender covenant exception significantly

qualifies the lessee's repair obligations," but holding that particular

circumstances may "compel a contrary conclusion in a given case") (applying

Texas law).

Here, the Court is interpreting two separate leases covering one building.

The newer Lease contains the surrender clause with a specific wear and tear

exception; the older Lease contains the more general clause stating that the

tenant shall keep the Building in good order and repair during the term of the

Lease, with no wear-and-tear exception and no reference to the tenant's

obligation upon surrender; both Leases are for long terms, such that

surrendering the Building with no ordinary wear and tear would, practically

speaking, require a complete renovation; Foot Locker built the building itself and

chose the components; and the Leases did not require Foot Locker to use the

Building for any particular purpose or to even occupy the Building.  The Court's

goal is to "construe the parties' agreement as a whole and attempt to harmonize

all clauses of the contract in order to give effect to the parties' intention."  Gorog,

760 F.3d at 793.  Moreover, "a contract's specific term controls over a general

term." Fortune Funding, L.L.C., 368 F.3d at 990 (citing Minnesota law).

The Court concludes that the Wisconsin Supreme Court's approach in

Lindsay Brothers v. Milwaukee Cold Storage Co., is appropriate under the

specific facts of the current case.  207 N.W.2d 639, 643 (Wis. 1973).  In <u>Lindsay</u>

<u>Brothers</u>, the lease at issue provided that the lessee "shall be responsible for and

shall make all other usual and necessary repairs," that this obligation "shall

include without limitation . . . the making of usual and necessary elevator repairs

[and] the maintenance of the elevators on the leased premises," and that the

lessee shall surrender the premises "in the same condition as the same were in at

the commencement of said term, reasonable wear and tear . . . excepted."  <u>Id.</u> at

641.  The court reasoned that "[t]he lessee's obligation for repairs is simply to

prevent him from claiming a breach of the lease by the landlord during the term

for the failure to make repairs that were the lessee's obligation and not the

lessor's."  <u>Id.</u> at 643.

> A reasonable reading of the repair and replacement clause of
> the lease reveals that the purpose of the paragraph is the delineation
> of the responsibilities of the parties during the period of the tenancy.
> A clause of this kind is properly construed to impose only a minimal
> duty on the tenant to undertake repairs.  He is obliged to keep the
> premises in such condition that he can use them for the purposes for
> which they are leased, but he is not obligated to do more.  Upon
> termination, a lessee is in full compliance if the premises, except for
> ordinary wear and tear, are in the same condition as they were at the
> commencement of the term.

<u>Id.</u> (citations omitted).

Thus, in this case, the Court concludes that the interplay of Article 2 and

Article 5 required Foot Locker to surrender "in good condition, wear and tear . . .

excepted."

> **b)      Article 2 of the 1920 Lease: Compliance with Applicable Statutes and Ordinances**

Article 2 of the 1920 Lease also required Foot Locker "faithfully to keep

and observe all statutes and ordinances in force, relating to said leased premises,

or the use thereof."   HFS claims that this clause required Foot Locker to keep all

elements of the Building up to applicable minimum building standards for

occupancy of the Building and to now pay the cost to repair all items listed in the

City's July 2015 Code Compliance Notice.

When a clause requires a tenant to maintain premises in good order during

a lease term and observe all laws during the term, the lease does not require the

tenant to make repairs to conform to laws after the lease terminates.  See In re

1600 Arch Ltd. P'shp, 938 F. Supp. 300, 302 (E.D. Pa. 1996) (holding that when

lease "made the tenant[s] responsible for compliance only 'during the Term of

the lease,'" and tenants did not "covenant to ensure the building's fitness for

lawful occupancy after their own lease ends, . . . they are not liable for the costs

of post-termination compliance work that would have been necessary even if the

property had stood vacant").  Addressing similar language, the Wisconsin

Supreme Court reasoned:

> That language contemplates that in the event of any order by a
> public authority which would prevent the lessee from making a safe
> and proper use of the property during the term of his lease, it is his
> obligation, and not the lessor's, to correct the defect.  If, by an order
> of the public authority, the use of the elevators had been forbidden
> as a safety measure, the lessee could not claim a breach of the lease
> or a constructive eviction but would be required to comply with the
> orders of the public authority if he wished to remain in possession
> and use the premises for the purposes intended.  The clause does not
> contemplate that the lessee shall have any responsibility whatsoever
> to obey the orders of a public authority after the termination of the
> lease and a yielding up of possession.

Lindsay Bros., 207 N.W.2d at 644. "While the duty to conform to an order of

public authorities affects the tenant's obligation during the course of the lease,

such an order is ineffective to modify his obligation for liability to make any

repairs following the termination of the lease." Id. at 645.

If Foot Locker had surrendered the Woolworth Building in "good

condition, wear and tear . . . excepted," Foot Locker would have complied with

its surrender obligation under the Leases, but the Building would not necessarily

have been compliant with 2015 City occupancy codes.  Based on the evidence in

the current record, the Building would still need new elevators, stairwells,

windows, plumbing, sprinklers, and more.  Even if Foot Locker had

35

continuously and legally occupied the Woolworth Building until the termination of the Leases, any proposed new use by HFS would have triggered a code-compliance obligation.

The Court rejects HFS's conclusion that Foot Locker violated the Leases because the City would not grant a Certificate of Occupancy after surrender.  The law provides that, when a lease requires a tenant to comply with the law during the term of the lease, that language does not require the tenant to bear the cost of code-compliance work required after the lease terminates.  Here, the Leases required no particular use of the Woolworth Building; nor did they require Foot Locker to occupy the building.  And, absent a contract provision to the contrary, Minnesota law does not require a commercial tenant to occupy or use the property that it leases.  See Plaza Associates v. Unified Dev., Inc., 524 N.W.2d 725, 730 (Minn. Ct. App. 1994).  Thus, Foot Locker did not violate the Leases by leaving the Building vacant.  So long as Foot Locker complied with the City's requirements for a registered vacant building and Foot Locker left the premises vacant, Foot Locker was complying with all statutes and ordinances and, thus, was complying with that portion of Article 2 of the 1920 Lease.

The various Notices of Certificate of Occupancy Revocation attached to the Joint Statement of Magner and Owens do not demonstrate that Foot Locker had violated the law, only that the Building was not eligible for a certificate of occupancy.  Because Foot Locker was not, in fact, occupying the Building, these Notices do not establish a violation of Article 2.  Thus, there was only one Correction Notice from the City, in February 2014, that noted code violations; HFS admits that Foot Locker corrected the issues identified in that Notice. (Hartnett Decl., Ex. 6, HFS 30(b)(6) Dep. 33-36.)

The fact that, after the Leases ended, HFS sought to change the use of the Woolworth Building by occupying it, which required a list of more than 100 repairs in order to comply with the City's ordinances for an occupancy certificate, does not implicate Foot Locker's obligations.  The Leases did not require Foot Locker to use the Woolworth Building in any particular way; nor did they obligate it to reconstruct the Woolworth Building in a manner compliant with HFS's unknown future use.  There is no evidence that, during the term of the Leases, Foot Locker failed to correct any repair required by the City, given that Foot Locker was no longer occupying the Building.  Thus, there is no evidence of breach of the second clause of Article 2 of the 1920 Lease.

c)  **Articles 7 and 8 of the 1949 Lease: Walls, Fixtures, Equipment, and Movable Machinery**

Foot Locker further argues that Articles 7 and 8 of the 1949 Lease are irreconcilable with HFS's interpretation of Article 2 of the 1920 Lease and Article 5 of the 1949 Lease.  Foot Locker reasons that, because Article 7 of the 1949 Lease gave it the right to demolish interior walls and did not require it to restore them, HFS cannot now require Foot Locker to pay to restore the Woolworth Building's interior walls.  Foot Locker further points out that Article 8 of the 1949 Lease gave it the right to remove its "trade fixtures, equipment, and other personal property, which it may have stored or installed in the demised premises, including but not limiting the same to . . . air conditioning, cooling, and other moveable machinery."  It claims that mechanical systems, electrical equipment, furnaces, and boilers do not become a part of the building upon installation and do not constitute improvements that tenants are obligated to leave, repair, or replace at the end of the lease term unless the lease specifically so states.

At this stage, it is premature for the Court to attempt to determine whether a particular item, such as the boiler or air conditioner, was Foot Locker's to remove.  The 1949 Lease broadly defines Foot Locker's equipment, trade fixtures, and personal property and allows it to remove walls.  Minnesota case law has

38

upheld a broad definition of items that do not become part of the realty,

including heating systems and lighting and electric systems; however, those

decisions are generally based on questions of fact based on the particular

circumstances of the case.  See, e.g., Cohen v. Whitcomb, 170 N.W. 851, 852

(Minn. 1919) (noting that the question of whether a "heating plant was so affixed

to the realty as to become a part thereof was a question of fact for the jury" and

upholding jury's finding heating plant was removable fixtures and not an

improvement); Johnson v. Grady, 244 N.W. 409, 410 (Minn. 1932) (upholding

finding that lighting equipment for a golf course was not an improvement).

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1.   Foot Locker Specialty, Inc.'s Motion for Partial Summary
     Judgment [Docket No. 25] is **GRANTED IN PART** and
     **DENIED IN PART** as follows:

     a.   Foot Locker's motion for summary judgment on Count
          Two: Negligence is **DENIED**.

     b.   Foot Locker's motion for summary judgment on Count
          Three: Waste is **DENIED**.

     c.   Foot Locker's motion for summary judgment on Count
          Four: Declaratory Judgment is **DENIED**.

    d.  Foot Locker's motion for summary judgment on Count One: Breach of Contract to the extent it is based on the application of the statute of limitations to Article 2 of the 1920 Lease is **DENIED**.

    e.  Foot Locker's request for an order that HFS is responsible for bringing the Woolworth Building into compliance with current building codes following termination of the Leases is **GRANTED**.

    f.  Foot Locker's request for an order that, under Articles 7 and 8 of the 1949 Lease, Foot Locker is not responsible for repair or replacement costs associated with the Woolworth Building's interior walls, mechanical systems, electrical systems, or other fixtures, equipment, or moveable machinery in the Building is **DENIED WITHOUT PREJUDICE** as premature.

    g.  Foot Locker's request for an order that the diminution in value is the proper measure of damage for the breach of contract claim is **DENIED**.

2.    H.F.S. Properties' Motion for Partial Summary Judgment [Docket No. 30] is **GRANTED** as follows: the Court strikes Foot Locker's affirmative defense of economic waste and holds that the applicable measure of damages for Count One is the reasonable cost to complete the repairs required under the Leases.

Dated:  February 2, 2017        s/ Michael J. Davis
                                      Michael J. Davis
                                      United States District Court